**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CITY OF RIALTO, a California
municipal corporation; RIALTO
UTILITY AUTHORITY, a Joint Powers
Authority organized and existing
under the law of the State of
California,

*Plaintiffs,*

v.

WEST COAST LOADING
CORPORATION, a California
corporation; KWIKSET LOCKS, INC.,
a California corporation; EMHART
INDUSTRIES, INC.; AMERICAN
HARDWARE CORPORATION, a
Connecticut corporation; BROCO
ENVIRONMENTAL, INC.;
ENVIRONMENTAL ENTERPRISES, INC.;
AMERICAN PROMOTIONAL EVENTS,
INC., WEST; PYRO SPECTACULARS,
INC.; TROJAN FIREWORKS; ASTRO
PYROTECHNICS; ZAMBELLI
FIREWORKS MANUFACTURING CO.;
RAYTHEON COMPANY; GENERAL
DYNAMICS CORPORATION; TUNG
CHUN COMPANY; WONG CHUNG
MING, a/k/a CHUNG MING WONG;

WHITTAKER CORPORATION; AMEX
PRODUCTS, INC., f/k/a American
Explosives Company; TASKER
INDUSTRIES; GOLDEN STATE
EXPLOSIVES; EXPLOSIVE
TECHNOLOGIES INTERNATIONAL, INC.
(ETI), CALIFORNIA; EDWARD STOUT;
ELIZABETH RODRIGUEZ; JOHN
CALLAGY, as Trustee of the
Frederiksen Children's Trust
Under Trust Agreement dated
February 20, 1985; LINDA
FREDERIKSEN, as Trustee of the
Walter M. Pointon Trust dated
11/19/91 and as Trustee of the
Michelle Ann Pointon Trust Under
Trust Agreement dated February
15, 1985; MARY MITCHELL; JEANINE
ELZIE; STEPHEN CALLAGY; THE
MARQUARDT COMPANY, f/k/a
Marquardt Corporation; FERRANTI
INTERNATIONAL, INC.; ENSIGN-
BICKFORD COMPANY; ORDNANCE
ASSOCIATES; THOMAS O. PETERS;
DENOVA ENVIRONMENTAL, INC.;
BLACK & DECKER (USA) INC.;
KWIKSET CORPORATION; THOMAS O.
PETERS REVOCABLE TRUST;
PYROTRONICS CORPORATION; DELTA
T., INC., e/s/a Amex Products,
Inc.; COUNTY OF SAN BERNARDINO;
and ROBERTSON'S READY MIX, INC.,
                              *Defendants,*

v.

GOODRICH CORPORATION, a New
York corporation,
        *Plaintiff/third-party plaintiff-
                        Appellant,*

v.                                          No. 08-55474

UNITED STATES ENVIRONMENTAL                 D.C. No.
PROTECTION AGENCY; UNITED                   CV-00079-PSG-SS
STATES OF AMERICA,
 *Third-party defendants- Appellees,*       OPINION

                and

UNITED STATES DEPARTMENT OF
DEFENSE,
  *Defendant/third-party defendant-
                        Appellee.*

Appeal from the United States District Court
for the Central District of California
Philip S. Gutierrez, District Judge, Presiding

Argued and Submitted June 3, 2009
Pasadena, California

Filed August 14, 2009

Before: Pamela Ann Rymer and Susan P. Graber,
Circuit Judges, and Ann Aldrich,* District Judge.

*The Honorable Ann Aldrich, Senior United States District Judge for
the Northern District of Ohio, sitting by designation.

Opinion by Judge Graber

**COUNSEL**

Raymond B. Ludwiszewski and Michael K. Murphy, Gibson Dunn & Crutcher, LLP, Washington, D.C., for the plaintiff-appellant.

Sambar N. Sankar, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C., for the defendant-appellee.

**OPINION**

GRABER, Circuit Judge:

We must decide whether the availability of judicial review for "pattern and practice" claims, as discussed in *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991), extends to a claim brought by Goodrich Corporation challenging the United States Environmental Protection Agency's ("EPA") administration of unilateral administrative orders under 42 U.S.C. § 9606(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"). We hold that it does not and, therefore, affirm the district court's dismissal of Goodrich's claim for lack of jurisdiction.

FACTUAL AND PROCEDURAL HISTORY

The Rialto-Colon groundwater basin is an important source of water for San Bernardino County, California. The EPA has detected groundwater contaminants, including perchlorate and trichloroethylene, in municipal supply wells in the basin. The

EPA suspects that the source of the contaminants may be a particular 160-acre site in Rialto, California ("Rialto site"). The Rialto site has been, and is currently, used for industrial and commercial purposes. From approximately 1957 to 1962, Goodrich operated the site and conducted activities that may have contributed to pollution there.

CERCLA authorizes the EPA to issue unilateral administrative orders ("UAO") "as may be necessary to protect public health and welfare and the environment," if the EPA "determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility." 42 U.S.C. § 9606(a). In July 2003, the EPA issued a unilateral administrative order concerning the Rialto site ("UAO 2003-11" or "Order"). The Order directs Goodrich (and one other previous operator) to conduct a remedial investigation for contaminants. The "minimum investigation requirements" specified by the Order include detailed soil sampling and groundwater monitoring. Goodrich chose to comply with the Order and, accordingly, began the remedial investigation. Goodrich alleges that, at all times, it has complied with the Order.

On December 8, 2006, Goodrich filed a complaint ("initial complaint") against the City of Rialto, the Rialto Utility Authority, the United States Department of Defense, and the EPA in federal district court.[1] The initial complaint alleged contribution claims against the City, the Utility Authority, and the Department of Defense and a due process claim against the EPA. The contribution claims alleged that the contaminants originated, in whole or in part, from the activities of the other parties. The due process claim was premised on the alle-

---

[1]The initial complaint was a third-party complaint in a separate action brought by the City of Colton against a number of defendants. Neither party to this appeal asserts that the origin of the case has any bearing on the issue before us.

gation that, contrary to the EPA's position, per chlorate is not a "hazardous substance" subject to regulation by CERCLA. The initial complaint alleged that the CERCLA review provisions, on their face and as administered by the EPA, comprise a "coercive and fundamentally unfair regime" that violates due process.

Goodrich settled its contribution claims with the City and the Utility Authority and therefore withdrew those claims. The Department of Defense and the EPA filed a joint motion for judgment on the pleadings.

The district court denied the motion with respect to the claims against the Department of Defense but granted the motion with respect to the claims against the EPA. The court held that Goodrich could bring its contribution claims against other potentially responsible parties ("PRPs"), including the Department of Defense, because it "met the criteria for bringing suit under both [42 U.S.C. §§ 9607 and 9613]." The court held that it lacked jurisdiction over Goodrich's *as-applied* challenge to CERCLA's review provisions concerning the EPA's administration of UAO 2003-11. Specifically, the court held that "it is clear that [Goodrich] is attempting to obtain pre-enforcement review of the UAO issued to it by the EPA" and that such review is foreclosed by 42 U.S.C. § 9613(h). The court next held that it had jurisdiction over Goodrich's *facial* challenge to CERCLA's review provisions, but rejected that claim on the merits. Finally, the district court held that, contrary to Goodrich's arguments, the initial complaint did not assert a "pattern and practice" claim.

Goodrich did not appeal that dismissal. Instead, it filed a first amended complaint ("complaint"). That complaint reiterates the contribution claims against the Department of Defense and clearly alleges a "pattern and practice" claim against the EPA. The complaint characterizes UAOs as "emergency orders" and alleges that the EPA "routinely" issues emergency orders "where no conceivable emergency

exists," thereby "read[ing] the emergency requirement entirely out of the statute." The complaint also alleges that the EPA "obstruct[s] judicial review of those orders by delaying its discretionary certification of completion." Finally, the complaint alleges that the EPA "control[s] and manipulat[es] . . . the 'Record of Decision' which supports the agency's selection of a response action. That record is compiled entirely by US EPA, and amounts to nothing more than a one-sided advocacy document favoring the agency's choices." Goodrich seeks

> a judicial declaration that US EPA's pattern and practice in administering CERCLA's unilateral administrative orders regime embodied in [42 U.S.C. §§ 9606, 9607(c)(3), and 9613(h)] is unconstitutional and, therefore, the UAO issued to [Goodrich] is unenforceable because it was issued pursuant to unconstitutional procedures.

The EPA filed a motion for judgment on the pleadings. The district court granted the motion, holding that it lacked jurisdiction over the "pattern and practice" claim because of the jurisdiction-stripping provision contained in 42 U.S.C. § 9613(h). The district court entered a final judgment on the "pattern and practice" claim pursuant to Federal Rule of Civil Procedure 54(b). Goodrich timely appeals.

## DISCUSSION

We review de novo whether subject matter jurisdiction exists. *Schnabel v. Lui*, 302 F.3d 1023, 1029 (9th Cir. 2002).

### A.   *Statutory Framework*

[1] CERCLA "was designed to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United*

*States*, 129 S. Ct. 1870, 1874 (2009) (internal quotation marks omitted). "As its name implies, CERCLA is a comprehensive statute that grants the President broad power to command government agencies and private parties to clean up hazardous waste sites." *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994). The Supreme Court has described the two primary methods of effecting cleanup: "Under CERCLA, the Federal Government may clean up a contaminated area itself, see § 104 [42 U.S.C. § 9604], or it may compel responsible parties to perform the cleanup, see § 106(a) [42 U.S.C. § 9606(a)]." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 161 (2004) (citation omitted).

Under the first option (which is not at issue here), the government pays for the cleanup under § 9604 and then seeks recovery for its costs from PRPs under § 9607. This option has an obvious drawback for the government: It must pay first and sue for recovery of costs later (often in protracted litigation). The second option—compelling PRPs to perform the cleanup—therefore has its advantages. As the Eighth Circuit noted, "[s]ince Superfund money is limited, Congress clearly intended private parties to assume clean-up responsibility." *Solid State Circuits, Inc. v. EPA*, 812 F.2d 383, 388 (8th Cir. 1987).

**[2]** Under the second option (which was used here), the EPA can issue UAOs to compel cleanup and other remedial measures under 42 U.S.C. § 9606(a).[2] That statute provides:

> In addition to any other action taken by a State or local government, when the President determines

---

[2]The EPA may also use mechanisms other than issuing UAOs to compel private parties to effect cleanup. Specifically, it can bring a direct enforcement action under § 9606(a) or initiate settlement negotiations among responsible parties under 42 U.S.C. § 9622. *See Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066, 1072-73 (9th Cir. 2006) (describing these possibilities).

that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The President may also, after notice to the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and welfare and the environment.

Once the EPA issues a UAO against a party, that party can obtain judicial review to challenge the validity of the UAO. But Congress limited the timing of such review in 42 U.S.C. § 9613(h). That provision, titled "Timing of review,"[3] provides:

> *No Federal court shall have jurisdiction* under Federal law other than [in circumstances irrelevant to this appeal] to review any challenges to removal or remedial action selected under section 9604 of this title, or *to review any order issued under section 9606(a)* of this title, in any action except one of the following [enumerated exceptions].

(Emphases added.) As detailed below, the enumerated exceptions permit judicial review of the validity of a UAO either *before* a PRP begins complying with the order or *after* the PRP has completed the work required by the order. Addition-

---

[3]Statutory titles may be consulted when we interpret a potentially ambiguous provision. *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 128 S. Ct. 2326, 2336 (2008).

ally, as soon as the PRP spends dollar one, and regardless of whether it has completed the work, it can bring cost-recovery claims against other PRPs. The result of the various statutory provisions is that, once the PRP begins complying with the order, it cannot seek judicial review of the validity of the order until it has completed the work required by the order. But it can always bring a cost-recovery claim against other PRPs to recover its own costs of complying with the order.[4] We turn now to the details of the enumerated exceptions to § 9613(h).

One of the enumerated exceptions, § 9613(h)(2), applies if the PRP declines to comply with the UAO and the EPA brings an enforcement action under § 9606(a). In such an enforcement action, the PRP can challenge the validity of the UAO as a defense to enforcement. *See* 42 U.S.C. § 9606(b)(1). This avenue for judicial review is not without risk, however. Section 9606(b)(1) states:

> Any person who, without sufficient cause, willfully violates, or fails or refuses to comply with, any order of the President under subsection (a) of this section may, in an action brought in the appropriate United States district court to enforce such order, be fined not more than $25,000 for each day in which such violation occurs or such failure to comply continues.

The potential for stiff fines undeniably creates a high risk for a PRP that chooses this course of action. But the clause "with-

---

[4]This case itself provides a good example of how the judicial review provisions work. The district court interpreted Goodrich's initial complaint as a direct challenge to UAO 2003-11 itself and, consistent with the statutory text, held that the court lacked jurisdiction over that claim because of § 9613(h). Goodrich did not appeal that ruling. Similarly, Goodrich brought cost-recovery and contribution claims against three parties. Goodrich settled those claims with two parties, and its claims against the Department of Defense remain pending before the district court.

out sufficient cause" mitigates that concern substantially. *See Employers Ins. of Wausau v. Browner*, 52 F.3d 656, 661 (7th Cir. 1995) (describing a PRP's options in this scenario). Even if a court disagrees with the PRP on the merits and orders it to comply with the UAO, the court can deny or reduce the fines if it concludes that the PRP's position was justified (even if ultimately unpersuasive). *See id.*

Another of the enumerated exceptions, § 9613(h)(3), applies once the PRP has completed the work required by the UAO and seeks reimbursement from the EPA under § 9606(b)(2)(A). If the EPA refuses reimbursement, the PRP can bring suit under § 9606(b)(2)(B) and obtain judicial review of the EPA's refusal. Reimbursement is required if the PRP was not responsible under § 9607(a), *see* § 9606(b)(2)(B) & (C), or if the PRP "can demonstrate, on the administrative record, that the President's decision in selecting the response action ordered was arbitrary and capricious or was otherwise not in accordance with law," § 9606(b)(2)(D). It is noteworthy that the latter option applies whether or not the PRP was responsible for the contamination; that is, reimbursement is appropriate if the order was arbitrary or unlawful, even if the PRP was responsible for the contamination. The statute also expressly authorizes recovery of attorney fees and related costs. *Id.* § 9606(b)(2)(E).

A third enumerated exception,[5] § 9613(h)(1), applies as soon as the PRP begins complying, whether or not it has completed the work required by the UAO. Once the PRP has incurred its own costs, it can seek cost recovery from other PRPs under § 9607(a)(4)(B). *United States v. Atl. Research Corp.*, 551 U.S. 128, 127 S. Ct. 2331, 2334 (2007); *see also* 42 U.S.C. § 9613(f)(1) (allowing contribution claims in certain circumstances). Indeed, Goodrich's claims here against

---

[5]The final two enumerated exceptions do not concern UAOs. *See id.* § 9613(h)(4) (concerning citizen suits); *id.* § 9613(h)(5) (concerning compelled remedial actions).

the Department of Defense, the City, and the Utility Authority are just those types of claims.[6]

In summary, a PRP can obtain judicial review of the validity of a UAO either *before* or *after* it has complied with the order and, as soon as it spends dollar one, it can *always* seek cost recovery from other PRPs and obtain judicial review of those claims. It is true that there are some limitations and disincentives attendant to each avenue of judicial review. But Congress intentionally chose *not* to authorize judicial review whenever a PRP desired. Instead, by specifying the "[t]iming of review" in § 9613(h), Congress chose to prioritize "the timely cleanup of hazardous waste sites." *Burlington*, 129 S. Ct. at 1874 (internal quotation marks omitted).

**[3]** The three situations described above illustrate Congress' preference for timely cleanup. CERCLA permits PRPs to challenge the validity of a UAO primarily *once the work required by the order is completed*. To protect entities from over-reaching by the EPA, the statute also authorizes challenges before work has begun, but only under threat of fines if the challenge is not justified by "sufficient cause." § 9606(b)(1). CERCLA also allows PRPs to allocate costs among themselves while the work is underway (or after the work has been completed), but that litigation does not delay the cleanup activities. In sum, litigation can delay cleanup activities only if a PRP has "sufficient cause" to challenge the validity of the UAO; otherwise, litigation during cleanup activities will concern only allocation of costs among PRPs and will not delay the cleanup activities themselves. Congress

---

[6]In *Atlantic Research*, 127 S. Ct. at 2337-38, the Supreme Court distinguished between cost-recovery claims brought under § 9607(a)(4)(B) and contribution claims brought under § 9613(f)(1). Here, in its order denying the Department of Defense's motion for judgment on the pleadings, the district court held that Goodrich's claim against the Department of Defense could proceed as either a cost-recovery claim or a contribution claim. That claim is not before us on appeal, and the Supreme Court's distinction between the two types of claims is not relevant to this appeal.

thus ensured the timely cleanup of hazardous waste sites while, at the same time, protected PRPs by providing judicial review over agency action at specified stages in the process and judicial review of cost recovery claims as soon as a PRP begins to comply with the order.

[4] Goodrich's facial challenge to the adequacy of the judicial review provisions is not before us directly, because Goodrich did not appeal the district court's rejection of that claim. That issue nevertheless underlies the question that we face on appeal. In a lengthy, detailed, and well-reasoned opinion, the Seventh Circuit rejected the same claim. *Employers Ins. of Wausau*, 52 F.3d at 659-67. The thrust of the Seventh Circuit's reasoning is that, although CERCLA's judicial review provisions contain some pitfalls and difficult decisions for a PRP that faces a UAO, there are ample and adequate opportunities to seek meaningful judicial review and, therefore, the statute comes nowhere near violating due process. *See id.* at 660 ("The constitutional challenge is baseless; as we shall see, the remedies that the Superfund law creates against invalid clean-up orders fully satisfy the requirements of due process."). With that background in mind, we turn to Goodrich's "pattern and practice" claim.

B.    *"Pattern and Practice" Claim*

Goodrich acknowledges that § 9613(h) bars direct judicial review of UAO 2003-11, because Goodrich has begun—but has not yet completed—the remedial work required by the Order. Instead, Goodrich argues that its "pattern and practice" claim can proceed despite § 9613(h). Invoking *McNary*, 498 U.S. 479, Goodrich argues that its "pattern and practice" claim does not seek judicial review of UAO 2003-11 directly and therefore does not come within the reach of § 9613(h)'s bar to federal court jurisdiction. As we shall see, the phrase "pattern and practice" is not an automatic shortcut to federal court jurisdiction.

In *McNary*, the Supreme Court addressed a statute concerning certain amnesty provisions for undocumented aliens. 498 U.S. at 484-85. Those provisions allowed aliens to apply for "SAW status," *id.* at 484,[7] which conferred many rights, including employment rights and protection against certain forms of deportation, *id.* at 490-91. But the statute forbade direct judicial review of the agency's individual determinations of an alien's eligibility for this benefit. *Id.* at 486. The only provision for judicial review appeared in the context of a deportation proceeding, if one was ever initiated against the alien. *Id.* A group of 17 unsuccessful applicants and a non-profit refugee organization brought suit in federal district court. *Id.* at 487. The plaintiffs did not challenge the denials of their individual applications but, instead, challenged the agency's practices as a whole. *Id.* at 487-88. They argued that the agency's implementation of the program violated due process by, for example, systematically denying the opportunity to challenge evidence, present witnesses, and bring translators to hearings. *Id.*

The Court held that section 210(e) of the Immigration and Nationality Act, which bars judicial review of individual SAW-status determinations except in deportation proceedings, did not foreclose a general, collateral challenge to the agency's unconstitutional procedures. *Id.* at 491-94. The Court first emphasized that the text of section 210(e) barred judicial review of individual determinations only. *Id.* at 491-92. Additionally, the Court observed that judicial review was subject to abuse-of-discretion review, limited to the administrative record, and available only in the courts of appeals. *Id.* at 493, 497. Those facts supported the Court's conclusion that Congress did not intend to foreclose general collateral challenges, because such challenges generally involve de novo review and require consideration of facts beyond the adminis-

---

[7]The Court's acronym, SAW, derived from the title of the status granted to qualifying aliens: "Special agricultural worker." 8 U.S.C. § 1160(a)(1); *see McNary*, 498 U.S. at 483.

trative record of any single SAW application, facts that typically must be developed by a federal district court. *Id.*

The Court then distinguished its opinion in *Heckler v. Ringer*, 466 U.S. 602 (1984). In *Ringer*, the Court declined to entertain a broad challenge to the Secretary's policy of refusing Medicare reimbursement for certain types of surgery before the plaintiffs exhausted their administrative remedies. *McNary*, 498 U.S. at 494-95. *The McNary* Court emphasized two distinctions. First, the relief sought by the *McNary* plaintiffs was not "a substantive declaration that they are entitled to SAW status" but, instead, was only an opportunity for reconsideration under constitutional procedures. *Id.* at 495. Second, the Court in *Ringer* had held that the plaintiffs " 'clearly have an adequate remedy in [42 U.S.C.] § 405(g) for challenging [in the courts] all aspects of the Secretary's denial of their claims for payment for the . . . surgery.' " *McNary*, 498 U.S. at 495 (second bracketed alteration in original) (quoting *Ringer*, 466 U.S. at 617). By contrast, the Court held that the *McNary* plaintiffs "would not as a practical matter be able to obtain meaningful judicial review of their application denials or of their objections to INS procedures." *Id.* at 496; *see also id.* at 496-97 (describing the judicial review provisions as "tantamount to a complete denial of judicial review for most undocumented aliens"); *id.* at 497 (characterizing the provisions as "the practical equivalent of a total denial of judicial review of generic constitutional and statutory claims"); *id.* at 484 (stating that, if judicial review of the claim were not permitted in this case, "meaningful judicial review of [many respondents'] statutory and constitutional claims would be foreclosed").

In *Reno v. Catholic Social Services, Inc.* ("*CSS*"), 509 U.S. 43 (1993), the Supreme Court applied *McNary*'s rule to the plaintiffs' challenges to certain agency regulations. The Court held that, because the statutory provisions at issue in *CSS* were in all relevant respects identical to the statutory provisions at issue in *McNary*, the plaintiffs' challenges were not

barred by statute. *Id.* at 55-56. The statutory bar to judicial review, "however, is not the only jurisdictional hurdle in the way of the . . . plaintiffs, whose claims still must satisfy the jurisdictional and justiciability requirements that apply in the absence of a specific congressional directive." *Id.* at 56. In particular, the Court held that the plaintiffs must bring claims in " 'a controversy "ripe" for judicial resolution.' " *Id.* at 57 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)).

The Court acknowledged that, in most circumstances, the same act that would ripen a claim would also bring the claim within the reach of the statutory bar to federal court jurisdiction, thus requiring the plaintiffs to bring their claims at the time envisioned by the statutory scheme of judicial review. *Id.* at 60. The Court distinguished *McNary* on the ground that the "procedural objections" raised by the plaintiffs in *McNary*, unlike the claims in *CSS*, "could receive no practical judicial review within the scheme established by [statute]." *Id.* at 61.

**[5]** We have distilled two "guiding principles," *Ortiz v. Meissner*, 179 F.3d 718, 721-22 (9th Cir. 1999), or "clear propositions," *Naranjo-Aguilera v. INS*, 30 F.3d 1106, 1112-13 (9th Cir. 1994), from the Court's decisions in *McNary* and *CSS*. As we summarized in *Proyecto San Pablo v. INS*, 189 F.3d 1130, 1138 (9th Cir. 1999), "[i]n order to determine jurisdiction, we first ask whether the claim challenges a 'procedure or policy that is collateral to an alien's substantive eligibility,' for which 'the administrative record is insufficient to provide a basis for meaningful judicial review.' " (Quoting *Ortiz*, 179 F.3d at 722); *see also Immigrant Assistance Project of L.A. County Fed'n of Labor (AFL-CIO) v. INS*, 306 F.3d 842, 862-64 (9th Cir. 2002) (applying the rule); *Naranjo-Aguilera*, 30 F.3d at 1112-14 (same). At this first step, we have stressed the importance of meaningful judicial review of agency action. *See, e.g.*, *Ortiz*, 179 F.3d at 722 ("More important, unless the district court has jurisdiction, there will be no meaningful opportunity for these plaintiffs to obtain a resolution of this claim."). Indeed, in *Naranjo-Aguilera*, 30 F.3d at

1114, we rejected jurisdiction over the plaintiffs' claim in part because we held that the claim "can be effectively advanced in the context of an appeal from an individual order of deportation."

**[6]** "Second, we ask whether Plaintiffs' claim is ripe. In order for ripeness to be satisfied, Plaintiffs must have taken 'the affirmative steps that [they] could take before the INS blocked [their] path.' " *Proyecto San Pablo*, 189 F.3d at 1138 (alterations in original) (quoting *CSS*, 509 U.S. at 59)*; see also Naranjo-Aguilera*, 30 F.3d at 1113-14 (discussing the ripeness analysis). This step derives directly from the Supreme Court's holding in *CSS* that, even if there is no statutory bar to jurisdiction, a plaintiff 's claim "still must satisfy the jurisdictional and justiciability requirements that apply in the absence of a specific congressional directive." 509 U.S. at 56.

Although all of the cases we have just summarized involve judicial review provisions within immigration statutes, the principles announced there apply more generally to all statutes that bar judicial review of *individual* agency actions. For instance, in *Skagit County Public Hospital District No. 2 v. Shalala*, 80 F.3d 379, 384-85 (9th Cir. 1996), we addressed a Medicare statute that barred judicial review of individual reclassification decisions. Relying on *McNary*, the plaintiff sought review of the agency's *procedures* in making an individual determination. *Id.* at 385-86. We acknowledged the distinction between a procedural challenge and a substantive challenge. *Id.* at 386. But we were ultimately unpersuaded that the plaintiff 's claim could proceed because, even though the plaintiff challenged an agency procedure, the plaintiff sought *direct* relief from the agency's reclassification decision, not the *collateral* relief sought by the plaintiffs in *McNary*. *Id.* at 385-87. We were careful to "illustrate[ ] the distinction between precluded judicial review . . . and [permissible] judicial review of 'methods' and other collateral issues." *Id.* at 386.

Similarly, in *Mace v. Skinner*, 34 F.3d 854, 856 (9th Cir. 1994), we addressed "whether a district court can exercise federal question jurisdiction over a *Bivens*-type action that challenges conduct arising out of an administrative agency decision, when the relevant statute appears to vest jurisdiction exclusively in the appellate courts." We held that the claims could proceed because the claims, "like those asserted in *McNary*, are not based on the merits of [the plaintiff's] individual situation, but constitute a broad challenge to allegedly unconstitutional [agency] practices." *Id.* at 859. We made clear that the district court lacks jurisdiction over a challenge to the agency's "actions" or "conduct" "in adjudicating a specific individual claim," but district courts do have jurisdiction over "a broad challenge" to the agency's "procedures" or "practices."[8] *Id.* at 858-59.

[7] With those principles in mind, we turn to the details of Goodrich's "pattern and practice" claim. As discussed above, we first ask whether the claim brings a collateral, procedural challenge to the EPA's practices, where no meaningful judicial review is otherwise available. If so, we next ask whether the claim is ripe.[9] We discern three distinct claims from the

---

[8]Although we did not mention the ripeness prong of the analysis in either *Skagit* or *Mace*, that is not surprising. In *Skagit*, we held that we lacked jurisdiction at the first step of the analysis, so there was no need to reach ripeness. And in *Mace*, the claim was plainly ripe, because the plaintiff's license had been revoked, allegedly due to the agency's unconstitutional procedures. In any event, it is beyond question that every claim before us must meet minimum constitutional requirements for jurisdiction, such as ripeness. *CSS*, 509 U.S. at 57.

[9]That two-step analysis applies when the judicial review provisions—like the provisions at issue in the immigration statutes in *McNary* and *CSS*, in the Medicare statute in *Skagit*, and in the Federal Aviation Act in *Mace*—bar only judicial review of *individual* orders. Here, the EPA argues that, because of differences between the text and structure of CERCLA and the text and structure of the other statutes, the judicial review provision at issue here, § 9613(h), sweeps more broadly, barring all judicial review concerning UAOs, not just judicial review of individual orders. According

allegations in the complaint: Goodrich alleges that the EPA has a pattern and practice of (1) issuing orders beyond its statutory authority (i.e., issuing "emergency" orders when "no conceivable emergency exists"); (2) refusing to certify completion of the work required by a UAO, even though the work has, in fact, been completed, so as to delay judicial review; and (3) controlling the record of decision and manipulating it to present "a one-sided advocacy document favoring the agency's choices." We will address those allegations in turn.

### 1.   *EPA's Statutory Authority to Issue UAOs*

**[8]** Goodrich's allegation that the EPA routinely issues orders beyond its statutory authority is decidedly substantive. True procedural challenges confront an agency's methods or procedures and do not depend on the facts of any given individual agency action. In *McNary*, for instance, the plaintiffs' challenge to the agency's refusal, as a matter of policy, to allow applicants to present witnesses or bring translators did not depend on the merits of any given individual application: the due process violation undermined the agency's entire system of adjudication. Here, by contrast, whether or not a UAO exceeds the EPA's statutory authority necessarily depends on factual considerations unique to that UAO, specifically, whether the issuance of the particular UAO in question met the *substantive* requirements of the statute. *Compare Ortiz*, 179 F.3d at 722 (holding that the district court had jurisdiction over the plaintiff's claims because "[t]he plaintiffs do not challenge the INS's interpretation of the substantive eligibility requirements for legalization, nor do they challenge the application of these requirements in any particular case"); *Proyecto San Pablo*, 189 F.3d at 1139 (same).

---

to the EPA, we therefore need not reach the two-step *McNary*-based analysis. Because we hold that, even assuming that the two-step analysis applies, the federal courts lack jurisdiction over Goodrich's claim, we need not and do not decide whether § 9613(h) bars only judicial review of individual orders or bars all judicial review concerning UAOs.

**[9]** Furthermore, meaningful judicial review of Goodrich's substantive challenge is available. CERCLA contemplates judicial review of a challenge to the validity of a UAO, both before a PRP complies with the order and after the work is completed. *See supra* Part A; 42 U.S.C. § 9606(b)(1) (permitting fines against a PRP who declines to follow a UAO only if the refusal is "without sufficient cause"); *id.* § 9606(b)(2)(D) (requiring reimbursement if "the President's decision in selecting the response action ordered was arbitrary and capricious or was otherwise not in accordance with law"). Those opportunities for judicial review may present some difficult decisions for a PRP that is subject to a cleanup order, see *supra* Part A, but they are a far cry from the "the practical equivalent of a total denial of judicial review," *McNary*, 498 U.S. at 497. *See also Mich. Ass'n of Homes & Servs. for Aging, Inc. v. Shalala*, 127 F.3d 496, 500 (6th Cir. 1997) (characterizing *McNary* as limited to "cases of futility").

Goodrich responds by noting that it is trying to challenge not just UAO 2003-11, but also all other orders that, it claims, are similarly defective. To the extent that Goodrich seeks to challenge other orders issued to other PRPs, Goodrich correctly perceives that CERCLA does not provide meaningful judicial review—or any judicial review at all—over that aspect of Goodrich's claim.[10] But the substantive nature of Goodrich's claim deprives that observation of import. Goodrich cannot evade the "timing of review" limitation on a substantive challenge to *its* order simply by asserting that *other* orders, too, might suffer from a similar alleged substantive flaw. That conclusion follows not only from logic, but also from constitutional requirements.

---

[10]We do note that, in a proper action challenging the validity of a UAO, the EPA's issuance of other UAOs may have evidentiary value in persuading the reviewing court that the UAO under review was issued beyond the EPA's statutory authority. Such evidence might be admissible as "supplemental materials" under 42 U.S.C. § 9613(j)(1).

As the Supreme Court noted in *CSS*, 509 U.S. at 56, "pattern and practice" claims must meet not only statutory requirements, but also "the jurisdictional and justiciability requirements that apply in the absence of a specific congressional directive." In particular, we are concerned here with Goodrich's standing. The Supreme Court's "standing jurisprudence contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement, and prudential standing, which embodies judicially self-imposed limits on the exercise of federal jurisdiction." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (citations and internal quotation marks omitted). The three "now-familiar" requirements for Article III standing are "injury in fact, causation, and redressability." *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "[P]rudential standing encompasses the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Newdow*, 542 U.S. at 12 (internal quotation marks omitted).

**[10]** Goodrich clearly has standing to challenge the validity of UAO 2003-11 because, assuming that Goodrich's allegations are correct and the EPA issued the Order *ultra vires*, Goodrich has suffered concrete and particularized harm, *see Lujan*, 504 U.S. at 560, and seeks to litigate its own rights, *see Newdow*, 542 U.S. at 12. But, because of the limitation on the timing of judicial review, § 9613(h), Goodrich must await completion of the work required by UAO 2003-11 to bring its individual challenge. As to Goodrich's challenge to all other UAOs, though, Goodrich plainly lacks standing. Even if the EPA issued improper orders to other entities at other sites, Goodrich suffered no concrete and particularized harm as a result and, in any event, Goodrich lacks prudential standing to litigate the rights of those third parties. In short, Goodrich's

challenge amounts to nothing more than a substantive challenge to the legal validity of UAO 2003-11—for which judicial review is available, just not now—along with a substantive challenge to the legal validity of all other UAOs issued against other parties—which Goodrich lacks standing to bring.

We next note that the nature of the relief sought by Goodrich is very different from the nature of relief sought by the plaintiffs in *McNary*. The plaintiffs in *McNary* sought relief that would not, and could not, confer SAW status on them; rather, they sought a fair hearing. By contrast, Goodrich here seeks the very same objective that successful direct review of UAO 2003-11 would produce: invalidation of the Order. Indeed, Goodrich's complaint seeks a declaration that the EPA's pattern and practice is unconstitutional *and that UAO 2003-11 is unenforceable for that reason*. Goodrich's claim is therefore similar to the claims in *Ringer* that the *McNary* Court discussed. *See McNary*, 498 U.S. at 494-96. Like the claims in *Ringer*, Goodrich's claim here is, "at bottom," *id.* at 495, nothing more than a request for direct review of the validity of UAO 2003-11. *See also Skagit*, 80 F.3d at 385-87 (holding that the district court lacked jurisdiction over the plaintiff's claim because it sought direct review of agency action, not collateral review as in *McNary*).

The Supreme Court's decision in *McNary* was not meant to oust normal administrative procedures and other prerequisites to judicial review, except in certain exceptional circumstances. In *McNary*, the Court emphasized the importance of the rights and benefits conferred by SAW status. *See McNary*, 498 U.S. at 490 ("We preface our analysis . . . with an identification [that] . . . it is undisputed that SAW status is an important benefit for a previously undocumented alien."); *id.* at 491 ("Thus, the successful applicant for SAW status acquires a measure of freedom to work and to live openly without fear of deportation or arrest that is markedly different from that of the unsuccessful applicant."). Given that substan-

tial liberty interest and the "well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action," *id.* at 496, the Court concluded that Congress could not have intended to isolate the aliens from seeking judicial review of their valid constitutional claims.

Here, we acknowledge the economic hardship that a PRP faces in complying with a UAO. But an economic hardship is different in kind from deprivation of a substantial liberty interest. Furthermore, as we noted above, in Part A, a PRP's economic hardship is substantially mitigated by the provisions authorizing full judicial review of an order either before or after the PRP complies, coupled with the provisions authorizing judicial review of cost-recovery claims (like the ones Goodrich brought here against the City, the Utility Authority, and the Department of Defense) as soon as the PRP begins to comply.

**[11]** In short, the district court correctly held that it lacks jurisdiction over this claim: Goodrich brings a substantive challenge over which CERCLA grants meaningful judicial review, just not at this time.

### 2. *The EPA's Discretionary Certification of Completion*

We next address Goodrich's allegation that the EPA routinely delays issuing a certification of completion in order to thwart judicial review. We need not decide whether that allegation constitutes a collateral, procedural challenge, because we hold that Goodrich's claim is not ripe. As announced by the Supreme Court in *CSS*, and echoed in our cases, *Proyecto San Pablo*, 189 F.3d at 1138; *Naranjo-Aguilera*, 30 F.3d at 1113-14, even claims that are not barred by statute may be barred by the ripeness doctrine. In particular, the "[p]laintiffs must have taken 'the affirmative steps that [they] could take before the [agency] blocked [their] path.' " *Proyecto San*

*Pablo*, 189 F.3d at 1138 (last two alterations in original) (quoting *CSS*, 509 U.S. at 59).

**[12]** Here, Goodrich fears that, once it has completed the work required by UAO 2003-11, the EPA will decline to certify completion. That claim is not ripe for adjudication because the feared harm has not yet been realized. *See Immigrant Assistance Project*, 306 F.3d at 859 ("The ripeness question is 'whether the harm asserted has matured sufficiently to warrant judicial intervention.' " (quoting *Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975)). By Goodrich's own admission, it has not completed the work required by UAO 2003-11. That being so, it has not "taken the affirmative steps that [it] could take before the [agency] blocked [its] path." *Proyecto San Pablo*, 189 F.3d at 1138 (internal quotation marks omitted). We therefore conclude that Goodrich's claim is not ripe.

We also observe that, when the claim does ripen, CERCLA provides Goodrich with judicial review. As explained by the Seventh Circuit in *Employers Insurance of Wausau*, 52 F.3d at 662, once Goodrich believes that it has completed the work, Goodrich has a claim under a standard reimbursement action brought under § 9606(b)(2)(B) and can argue in that action that the EPA's refusal to certify completion is in error. Critically, § 9606(b)(2)(A) authorizes a PRP to petition the government for reimbursement "60 days *after completion of the required action*" (emphasis added), not 60 days *after the EPA certifies completion*. The EPA's certification is not a prerequisite to bringing suit. As explained by the Seventh Circuit:

> If the party ordered to clean up a contaminated site claims to have completed the work, he has a claim for reimbursement, the reimbursement provision being available to "any person who receives and complies with the terms of any" Superfund clean-up order. § 9606(b)(2)(A). If the EPA turns down the claim on the ground that the clean-up has not been

completed . . ., the party has a right to sue and the agency can defend by showing that the clean-up has not been completed and thus that a condition of maintaining such a suit has not been fulfilled. The district court will adjudicate this ground for dismissal . . . .

*Employers Ins. of Wausau*, 52 F.3d at 662. As soon as Goodrich believes that it has completed the UAO 2003-11 work, it can petition the EPA for reimbursement and, if the EPA refuses, bring an action in federal court. But it cannot now, or then, seek judicial review of the EPA's refusal to certify completion concerning *other* UAOs to which Goodrich has no connection.

**[13]** In summary, the district court correctly held that it lacks jurisdiction over this aspect of the "pattern and practice" claim.

3.  *Control and Manipulation of the Administrative Record*

Finally, we address Goodrich's allegation that the EPA "controls" and "manipulates" the record of decision that supports the issuance of a UAO, thus preventing meaningful judicial review of the validity of the order. Goodrich correctly observes that, at least before the EPA issues an order, there is only a limited opportunity for a PRP to provide input into the administrative record, which the agency maintains. 42 U.S.C. § 9613(k). Goodrich also correctly observes that judicial review generally is limited to the administrative record. *Id.* § 9613(j)(1); *but see id.* (allowing a court to consider "supplemental materials" in some circumstances). Putting those observations together, Goodrich complains that the evidentiary basis for judicial review of the validity of a UAO is overly restricted.[11]

---

[11]We do not understand the complaint to allege that, for instance, the EPA destroys evidence or alters documents in the administrative record.

But a challenge to those statutory requirements is a facial challenge to the statute itself, not a "pattern and practice" claim. As noted above, the district court rejected, on the merits, Goodrich's facial challenge to the statute. Because Goodrich did not appeal that order, we do not reach Goodrich's facial challenge.

**[14]** In conclusion, we hold that the district court correctly held that it lacks jurisdiction over this allegation and over Goodrich's entire "pattern and practice" claim.

## C.  *Additional Precedents*

We are the first federal appellate court to address federal court jurisdiction of a "pattern and practice" claim concerning the EPA's administration of UAOs. But our conclusion is consistent with the views of at least two district court decisions addressing very similar claims. *See United States v. Capital Tax Corp.*, No. 04-C-4138, 2007 WL 488084 (N.D. Ill. Feb. 8, 2007) (unpublished); *Raytheon Aircraft Co. v. United States*, 435 F. Supp. 2d 1136 (D. Kan. 2006).

A third decision, in federal district court for the District of Columbia, warrants additional explanation. In *General Electric Co. v. Whitman*, 257 F. Supp. 2d 8 (D.D.C. 2003) ("*General Electric I*"), the plaintiff originally brought a facial challenge to the constitutionality of CERCLA's judicial review provisions. The district court dismissed that claim because of the jurisdictional bar in § 9613(h). *Id.* at 31. On appeal, the D.C. Circuit held that a facial challenge was not barred.[12] *Gen. Elec. Co. v. EPA*, ("*General Electric II*"), 360

---

If Goodrich believes that the EPA has violated its due process rights in such a manner concerning UAO 2003-11, it may so argue in any challenge to the validity *of that Order*—subject, of course, to the timing of review provision, § 9613(h). *See also* 42 U.S.C. § 9613(j)(4) (specifically contemplating judicial review of "procedural errors" made by the agency).

[12]A facial challenge to the statute itself is precisely the claim that Goodrich's initial complaint alleged here. The district court held that it had

F.3d 188, 191 (D.C. Cir. 2004) (per curiam). The court "remand[ed] the case to the district court to address the merits of GE's facial due process claim." *Id.* at 194.

On remand, the plaintiff argued that it had brought *two* claims: a facial due process claim and a "pattern and practice" claim. *Gen. Elec. Co. v. Johnson*, ("*General Electric III*"), 362 F. Supp. 2d 327, 333 (D.D.C. 2005). The district court agreed with the plaintiff and held that the D.C. Circuit's decision on statutory jurisdiction had encompassed *both* claims. *Id.* at 333-37. The district court therefore held that it had jurisdiction over the "pattern and practice" claim—not because of its independent analysis of the jurisdictional question, but because of its interpretation of the D.C. Circuit's decision in *General Electric II*.

Here, Goodrich urges us to conclude that we have jurisdiction over its "pattern and practice" claim, but it does not urge us to adopt *General Electric III*'s reading of *General Electric II*. Indeed, Goodrich mentions *General Electric II* only in passing and concedes in its opening brief that the D.C. Circuit "did not expressly address General Electric's pattern and practice claim." *See also Raytheon*, 435 F. Supp. 2d at 1154 (holding that the D.C. Circuit in *General Electric II* did *not* address the plaintiff's "pattern and practice" claim).

Of interest, the D.C. District Court recently ruled on the *merits* of the "pattern and practice" claim. *Gen. Elec. Co. v. Jackson*, 595 F. Supp. 2d 8 (D.D.C. 2009) ("*General Electric IV*"). That court held that, "based on the extensive record developed through years of discovery, the Court . . . concludes that GE has not shown that EPA's pattern and practice of administering section 106 of CERCLA [42 U.S.C. § 9606]

---

jurisdiction over that claim (just as *General Electric II* held that it had jurisdiction) and dismissed the claim on the merits. As we have noted, Goodrich did not appeal that determination.

violates due process." *Id.* at 39. Interestingly, that court held that there was "evidence of isolated errors" in some instances. *Id.* But,

> [e]rrors should be addressed by a PRP when they occur—either by not complying with a UAO and defending a subsequent enforcement proceeding or by complying with a UAO and seeking post-completion reimbursement. Those avenues remain available to PRPs under CERCLA as a more effective means to address the occasional errors revealed by the record before this Court. To the extent that [Goodrich] continues to believe that EPA generally overuses or abuses UAOs, thereby overstepping its mandate, any broader remedy should be sought from Congress, not the courts.

*Id.* We agree.

**AFFIRMED**.